## Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

NO. 18-9253                SECTION A(1)

KENNETH NASSET

VERSUS

UNITED STATES OF AMERICA

Deposition of MARK LEVIN, M.D., 6 GEL COURT, MONSEY, NEW YORK 10952, taken VIA ZOOM TELECONFERENCE, on Thursday, October 8, 2020. DEPONENT LOCATED AT 6 GEL COURT, MONSEY, NEW YORK 10952.

APPEARANCES:

   VASQUEZ LAW
   Attorneys at Law
   BY ZOOM TELECONFERENCE:
   JESSICA VASQUEZ, Esquire
   400 Poydras Street
   Suite 900
   New Orleans, Louisiana 70130

     ATTORNEYS FOR PLAINTIFF

   ASSISTANT UNITED STATES ATTORNEY
   Attorneys at Law
   BY ZOOM TELECONFERENCE:
   MARY KATHERINE KAUFMAN, Esquire
   650 Poydras Street
   Suite 1600
   New Orleans, Louisiana 70130

     ATTORNEYS FOR DEFENDANT

ALSO PRESENT VIA ZOOM TELECONFERENCE:

   KENNETH NASSET

REPORTED BY:

   VERNE B. MULLINS
   Certified Court Reporter
   Registered Diplomate Reporter
   Certified Shorthand Reporter (TX)

DAWN D. TUPPER, CCR, RPR
(504) 430-0491

## Page 2

KENNETH NASSET VS. UNITED STATES OF AMERICA

Deposition of MARK LEVIN, M.D.

Taken on October 8, 2020

EXHIBIT INDEX

1 - Bayer HealthCare Aspirin Regimen Box Warning.
2 - ENBREL® Package Insert.
3 - Declaration of Nkechinyere Emejuaiwe, MD

DAWN D. TUPPER, CCR, RPR
(504) 430-0491

## Page 3

INDEX

EXAMINATIONS
Page | Line

EXAMINATION BY MS. KAUFMAN      5     18
EXAMINATION BY MS. VASQUEZ     66     16

EXHIBITS

Exhibit #1                     55      2
Exhibit #2                     55      6

DAWN D. TUPPER, CCR, RPR
(504) 430-0491

## Page 4

S T I P U L A T I O N

It is stipulated and agreed by and between counsel for the parties hereto that the deposition of the aforementioned witness is hereby being taken under the Federal Rules of Civil Procedure, for all purposes, in accordance with law;

That the formalities of reading and signing are specifically waived;

That the formalities of sealing, certification and filing are specifically waived;

That all objections, save those as to the form of the question and the responsiveness of the answer, are hereby reserved until such time as this deposition, or any part thereof, may be used or sought to be used in evidence.

VERNE B. MULLINS, Registered Diplomate Reporter, Certified Court Reporter, in and for the Parish of Orleans, State of Louisiana, and Certified Shorthand Reporter (TX), officiated in administering the oath to the witness.

DAWN D. TUPPER, CCR, RPR
(504) 430-0491

## Page 25

```
09:36:55  1   A.  You can call the primary care physician to
09:36:59  2       help you navigate the records, tell you what's
09:37:02  3       important.  There are ways of looking through
09:37:04  4       the records that you pick up or learn, to
          5       learn to identify the most important records.
09:37:12  6       I would not say that every -- every patient
09:37:16  7       with 10,000 records gets all of the 10,000
09:37:18  8       records read, but that is a very rare
09:37:21  9       situation.
09:37:22 10           Nevertheless, one has to review them,
09:37:25 11       peruse them, look them over, whatever you call
09:37:28 12       it, focus on what's important.  Certainly,
09:37:33 13       look at the previous -- in the drugs the
09:37:35 14       patient is on, what problems are listed in the
09:37:38 15       record, and look through the important notes.
09:37:44 16       Every physician deals with that differently.
09:37:46 17       What's important is that you don't miss
09:37:49 18       anything.
09:37:50 19   Q.  Have you ever written a prescription for
09:37:55 20       HUMIRA® or ENBREL®?
09:37:57 21   A.  I have.
09:37:58 22   Q.  About how many?
09:38:01 23   A.  I would say maybe a dozen.
09:38:05 24   Q.  Okay.  And for what?
09:38:07 25   A.  Most of the time, for -- for arthritis,
```

## Page 26

```
09:38:15  1       rheumatoid arthritis, psoriatic arthritis.
09:38:19  2       The -- my role in this is not to diagnose and
09:38:22  3       treat it, we already discussed that, by
09:38:27  4       getting referrals from the rheumatologist.
09:38:29  5       But infusion rooms will not take orders from
09:38:32  6       physicians who are not cleared to write orders
09:38:40  7       in infusion room, so the actual writing of the
09:38:44  8       orders falls to me.
09:38:46  9   Q.  And how are HUMIRA® and ENBREL® administered?
09:38:50 10   A.  They are administered through a subcutaneous
09:38:55 11       injection.
09:38:56 12   Q.  Okay.  Your declaration states that they're
09:38:59 13       administered through infusion; is that
09:39:04 14       correct?
09:39:04 15   A.  Well, let me just look at that.  I don't think
09:39:09 16       it was exactly the language.  You may be
09:39:16 17       referring to the first paragraph, says:  "As
09:39:19 18       an administrator and practitioner in infusion
09:39:22 19       suites, I'm familiar with drugs ENBREL® and
09:39:25 20       HUMIRA®, and I've written orders for those
09:39:25 21       medications."  Doesn't say that they were
          22       intravenous, unless there's some other place
          23       you're referring to.
09:39:32 24   Q.  Okay.  And what is the dosage for ENBREL®?
09:39:37 25   A.  It's 25 milligrams or 50 milligrams.  Usually
```

## Page 27

```
09:39:42  1       50 milligrams.
09:39:43  2   Q.  How often?
09:39:43  3   A.  Weekly.
09:39:45  4   Q.  And what about HUMIRA®?
09:39:47  5   A.  HUMIRA®, I don't remember.
09:39:52  6   Q.  And how do you consent patients when you
09:39:55  7       prescribe HUMIRA® and ENBREL®?
09:39:56  8   A.  The same way I do for my cancer patients.  We
09:39:59  9       sit down, I explain what the drug does.  I
09:40:04 10       explain what the side effects are, drawing
09:40:07 11       primarily on the prescribing information, and
09:40:11 12       then any drug in the infusion room gets a
09:40:14 13       written consent, which is pre-printed with all
09:40:16 14       the main side effects.
09:40:19 15           If there's something else to be added, I
09:40:21 16       write it in.  The patient signs it, I sign it,
09:40:24 17       and the witness signs it, and the patient gets
09:40:27 18       a copy, along with a printout that lists the
09:40:34 19       side effects and what to do if they occur.
09:40:36 20   Q.  Now, is that your practice or is that what the
09:40:40 21       law requires in New Jersey?
09:40:41 22   A.  There's no legal requirement.  It's an ethical
09:40:44 23       requirement, which is the part of the standard
09:40:46 24       of care, to obtain informed consent, and I
09:40:51 25       would say that a written consent of some kind
```

## Page 28

```
09:40:56  1       is universal.
09:41:00  2   Q.  For medication?
09:41:01  3   A.  Let me just say -- as well as the
09:41:03  4       documentation of having had this discussion,
09:41:06  5       and it is some kind of a statement that side
09:41:09  6       effects were discussed, including possibility
09:41:15  7       of death.
09:41:16  8           And the better practice is that some of
09:41:18  9       the side effects are actually written out in
09:41:20 10       the note.  I'm sorry, you -- you were asking
09:41:24 11       something?
09:41:25 12   Q.  You're saying written consent, you believe
09:41:28 13       that that is universal; is that correct, for
09:41:31 14       medication?
09:41:32 15   A.  Correct, correct.
09:41:33 16   Q.  If I told you that that's not the law in
09:41:41 17       Louisiana, would that change your opinion?
09:41:43 18   A.  No, it's not a law.  It's an ethical --
09:41:47 19       bioethical, widely-accepted requirement
09:41:50 20       because of standard of care, that's my
09:41:52 21       understanding of how these things work.
09:41:54 22   Q.  You stated in your declaration that:  "As soon
09:42:00 23       as Mr. Nasset began taking ENBREL® once every
09:42:04 24       week, not once every two weeks, he immediately
09:42:06 25       had heart failure."  Correct?
```

DAWN D. TUPPER, CCR, RPR
(504) 430-0491

## Page 49

```
10:05:43   1    A.  Yes.
10:05:49   2    Q.  And how often have you recommended patients
10:05:51   3        take aspirin?
10:05:53   4    A.  A few times a week.
           5    Q.  Do you give patients a verbal consent for
10:05:58   6        aspirin or a written consent?
10:06:01   7    A.  No, a verbal consent.
10:06:05   8    Q.  Okay.  And for aspirin, what warnings do you
10:06:10   9        give to the patient?
10:06:14  10    A.  Well, aspirin and over-the-counter medication.
10:06:17  11        A patient can go themselves and buy it in the
10:06:20  12        pharmacy, you know.  The requirements for
10:06:22  13        consent would be unique and specific to the
10:06:25  14        patient.  And, say, somebody has a bleeding
10:06:27  15        problem, you would have to explain that
10:06:29  16        aspirin increases the chance of bleeding.
10:06:31  17        It's a different ball game, altogether, than
10:06:34  18        something like an injectable medication,
10:06:36  19        multiple side effects like ENBREL®.
10:06:55  20            MS. KAUFMAN:  Okay.  Verne, if I could
10:06:56  21        share my screen for a minute.
10:06:56  22            THE STENOGRAPHER:  Sure.
10:06:57  23            MS. KAUFMAN:  I have the box warning for
10:06:59  24        ENBREL®, and I just want to show it to
10:07:01  25        you.
```

DAWN D. TUPPER, CCR, RPR
(504) 430-0491

## Page 50

```
10:07:01   1    EXAMINATION BY MS. KAUFMAN:
10:07:10   2    Q.  Do you recognize this?
10:07:11   3    A.  Aspirin.
10:07:13   4    Q.  Okay.  If you were going to give a patient
10:07:17   5        aspirin, what warnings would you give -- would
10:07:20   6        you tell them about?
10:07:22   7    A.  As I said, it's an over-the-counter
10:07:31   8        medication, it doesn't have the same
10:07:33   9        requirement for consent.  I might go over some
10:07:37  10        of the basic things, like -- like allergies or
10:07:45  11        bleeding problems, I would find out if they're
10:07:47  12        taking any other drugs that can increase
10:07:50  13        bleeding, stomach upset, but that would be
10:07:54  14        probably ulcers, you know.  That would
10:07:56  15        probably be what I would talk to them about.
10:07:59  16    Q.  Okay.  How do you decide which warnings to
10:08:08  17        advise them on?
10:08:09  18    A.  For over-the-counter medications, I just look
10:08:16  19        at the patient and I explain what I think
10:08:19  20        could really happen to them.  I don't need to
10:08:21  21        go through every possible side effects.  As I
10:08:24  22        said, they don't need me, they can walk into
          23        the pharmacy and order it, that's how the
10:08:29  24        system works.
10:08:30  25            So let's say, if somebody is older, I
```

DAWN D. TUPPER, CCR, RPR
(504) 430-0491

## Page 51

```
10:08:34   1        might ask them, do you have any nausea,
10:08:38   2        stomach pains, they may have ulcers.
10:08:42   3        Basically, it's a screening to see if I should
10:08:44   4        tell them not to take it.  Alcohol use,
10:08:48   5        allergies.  But it's a different level --
10:08:58   6        sorry about that.
10:08:59   7    Q.  Okay.  When you ask the patient those
10:09:01   8        questions, do you rely on the patient to be
10:09:03   9        truthful with you?
10:09:05  10    A.  Yes.
10:09:05  11    Q.  Okay.  Looks like I clicked something, sorry.
10:09:15  12        Hold on just a second.
10:09:17  13            Okay.  Now I'd like to talk about ENBREL®.
10:09:23  14        Does a doctor need to get consent on all risks
10:09:26  15        listed with ENBREL®?
10:09:31  16    A.  Anything that the prescribing information
10:09:35  17        considers important enough to list as a
10:09:36  18        separate category should be reviewed.
10:09:39  19    Q.  Okay.  And what risks do you get consent on?
10:09:43  20    A.  I don't understand the question.
10:09:46  21            THE WITNESS:  Can I ask for just a quick
10:09:48  22        moment?  Maybe a minute?
10:09:51  23            MS. KAUFMAN:  Sure.
10:09:55  24            THE WITNESS:  Bathroom break?  Thank you.
10:09:58  25        I know time is limited.  I'll be fast.
```

DAWN D. TUPPER, CCR, RPR
(504) 430-0491

## Page 52

```
10:11:21   1            (A recess was taken at 10:11 a.m.)
10:12:00   2            (On the record at 10:12 a.m.)
10:12:01   3            THE WITNESS:  Okay.  I'm back.  Sorry
10:12:03   4        about that.
10:12:03   5            MS. KAUFMAN:  That's okay.
10:12:03   6    EXAMINATION BY MS. KAUFMAN:
10:12:04   7    Q.  So when you prescribe ENBREL®, what risks do
10:12:06   8        you get consent on?
10:12:07   9    A.  So it's a question of a balance.  We don't
10:12:14  10        want to just read from it, prescribing
10:12:18  11        information, because it doesn't explain
10:12:19  12        anything.  If you explain every single thing,
10:12:21  13        it's a long process, and the patient
10:12:25  14        doesn't -- you know, doesn't remember it, and
10:12:27  15        by the time you finish, forgets the beginning.
10:12:30  16            So what I personally do is I make sure
10:12:34  17        that I mentioned each heading in the
10:12:37  18        prescribing information.  Like, say, if it
10:12:39  19        says cardiovascular problems, I say there'll
10:12:42  20        be heart problems that can happen.
10:12:45  21            I individualize, I explain what it means
10:12:47  22        for the patient.  In the case of ENBREL®, the
10:12:49  23        issue would be, I would say, you have some
10:12:51  24        tendency towards this, because when you wear
10:12:54  25        it -- since you've had a heart attack sometime
```

DAWN D. TUPPER, CCR, RPR
(504) 430-0491

## Page 53

```
10:12:59  1   in the past, and you may develop heart
10:13:01  2   failure, so I want to focus on that a little
10:13:02  3   bit more.
10:13:05  4         There are other alternatives, would you
          5   like me to explain them? And usually they say
10:13:10  6   yes, we get into a discussion. If -- if there
10:13:15  7   is a listing, let's say if it says -- if there
10:13:19  8   are gastrointestinal -- just for
10:13:20  9   illustration -- gastrointestinal symptoms,
10:13:22 10   expect that to affect your stomach and colon,
10:13:24 11   then I would go over a few things, you know,
10:13:28 12   maybe nausea, maybe diarrhea.
10:13:30 13         Things that are really relevant to the
10:13:32 14   patient, like in this case, developing a heart
10:13:34 15   failure, I would make sure I linger over and
10:13:37 16   discuss.
10:13:37 17   Q. Okay. And you said that's what you personally
10:13:40 18      do. Correct?
10:13:41 19   A. Correct.
10:13:42 20   Q. And what is your source, where were you taught
10:13:51 21      that?
10:13:51 22   A. It makes sense, it's logical. The point of
10:13:58 23      informed consent is to have an informed
10:14:00 24      consent. The patient should understand. It's
10:14:04 25      logical that you organize the risks in the
```

## Page 54

```
10:14:08  1   more likely to less likely order. And I would
10:14:12  2   say that that's what I see other physicians
10:14:17  3   do. In my opinion, this is the standard of
10:14:19  4   care, to do it the way I just described.
10:14:23  5 Q. Do you have a copy of the ENBREL® label in
10:14:27  6   front of you as you're doing this?
10:14:27  7 A. I don't actually, no. I can get it, if you'd
10:14:30  8   like.
10:14:30  9 Q. That's okay. Well, I'm saying, like, when you
10:14:33 10   are talking with a patient about ENBREL®, do
10:14:37 11   you have the label in front of you or the
10:14:39 12   packet insert?
10:14:40 13 A. I generally would, because it's not a drug I
10:14:43 14   prescribe often. Some of the chemotherapy
10:14:46 15   drugs, I can't --
10:14:48 16 Q. But your cancer drugs, you know those, so you
10:14:51 17   don't need the packet insert or label for
10:14:54 18   those. Correct?
10:14:54 19 A. Right. But not all of them, but some of them.
10:14:59 20   The other ones, yes, I do have it in front of
10:15:01 21   me.
10:15:02 22 Q. Okay. I could show you the ENBREL® packet
         23   insert?
10:15:08 24 A. Yes.
10:15:09 25       MS. KAUFMAN: And I guess just to clarify,
```

## Page 55

```
10:15:11  1   the aspirin insert would be Exhibit One.
10:15:15  2       (Exhibit #1 was marked for
10:15:16  3       identification.)
10:15:16  4       MS. KAUFMAN: And then Exhibit Two will be
10:15:17  5   the ENBREL® packet insert.
10:15:20  6       (Exhibit #2 was marked for
10:15:21  7       identification.)
10:15:21  8 EXAMINATION BY MS. KAUFMAN:
10:15:29  9 Q. Do you see it?
10:15:32 10 A. Yes.
10:15:33 11 Q. Okay. And so you said that, when prescribing
10:15:43 12   ENBREL®, you would get consent -- you would
10:15:48 13   advise the patient on congestive heart
10:15:54 14   failure. Correct?
10:15:55 15 A. Yes.
10:15:57 16 Q. And what other warnings would you tell the
10:15:59 17   patient about?
10:16:03 18 A. Well, if we go down, the way we approach this,
10:16:06 19   I see the warnings and precautions, but they
10:16:10 20   are more developed, as you go down. There is
10:16:16 21   a warning and precaution on heart disease.
10:16:19 22   Let me just find it. Says: "Congestive heart
10:16:22 23   failure, worsening or new onset may occur."
10:16:24 24       But then when you go into the side effects
10:16:30 25   section, it's a little bit more -- little bit
```

## Page 56

```
10:16:33  1   more expanded. And that's what I usually look
10:16:37  2   at when I talk to the patient, there's more
10:16:40  3   information.
10:16:40  4 Q. Do you advise a patient about the risks of
10:16:45  5   congestive heart failure, if they do not have
10:16:47  6   any prior heart issues?
10:16:48  7 A. As I said already, anything that has a
10:16:52  8   separate section for it, I would mention to
10:16:54  9   the patient.
10:16:55 10 Q. And that's what you would do, personally?
10:16:59 11 A. Yes. And I believe it's a standard, yeah.
10:17:02 12 Q. The standard of care for all doctors or New
10:17:08 13   Jersey?
10:17:08 14 A. All doctors. All reasonable physicians in the
10:17:11 15   country.
10:17:11 16 Q. Okay. Would you agree that the standard of
10:17:32 17   care does not require a doctor to verbally
10:17:34 18   consent on all risks to a patient?
10:17:36 19 A. I would agree that not every single risk needs
10:17:39 20   to be explained. That is practically
10:17:44 21   impossible.
10:17:46 22 Q. You also stated in your declaration that
10:17:55 23   Mr. Nasset consented to receive HUMIRA® once
10:17:58 24   every two weeks. Correct?
10:17:59 25 A. Yes.
```

## Page 57

```
10:18:00  1   Q.  Aren't ENBREL® and HUMIRA® both TNF inhibitors
10:18:11  2       used to treat psoriatic arthritis?
10:18:13  3   A.  Yes.
10:18:13  4   Q.  And aren't they both subcutaneous injection?
          5   A.  Yes.
10:18:16  6   Q.  So they're similar medications?
10:18:19  7   A.  They are, in some ways.
10:18:21  8   Q.  How are they different?
10:18:23  9   A.  They work differently.  There are different
10:18:30 10       schedule ones, every other week, one is every
10:18:35 11       week.  There was some indication in the record
10:18:39 12       he actually took HUMIRA® and tolerated it, and
10:18:42 13       other places, it seemed like it was always
10:18:44 14       ENBREL® from the beginning.
10:18:47 15             HUMIRA®, as far as I recall, doesn't cause
10:18:50 16       the same kind of a heart failure issue.
10:18:53 17   Q.  Okay.  Would you defer to a cardiologist on
10:18:58 18       how ENBREL® and HUMIRA® might affect a
10:19:00 19       patient's cardiovascular system?
10:19:02 20   A.  No.
10:19:02 21   Q.  Okay.  I didn't see in your report where you
10:19:08 22       rendered an opinion connecting ENBREL® to
10:19:12 23       Mr. Nasset's congestive heart failure; is that
10:19:30 24       correct?
10:19:31 25   A.  Well, I think it's pretty clear, from the
```

## Page 58

```
10:19:34  1       sequence from which you read -- read my
10:19:39  2       opinion.  For example, on page two, I say, had
10:19:42  3       this been properly done, and then you have
10:19:44  4       visits between 2005 to 2016, Dr. McGrath would
10:19:49  5       not have prescribed a TNF inhibitor.
10:19:54  6             I -- you know, to the extent that it may
10:19:57  7       not be clear to someone, I -- I'd like, for
10:20:03  8       the record, make it clear:  Yes, it did cause
10:20:04  9       his heart failure.
10:20:06 10   Q.  Okay.  So it's your opinion that ENBREL® did
10:20:09 11       cause Mr. Nasset's heart failure?
10:20:11 12   A.  Yes.
10:20:12 13   Q.  Okay.  Is that a new opinion today or are you
10:20:19 14       saying that that's in your report?
10:20:21 15   A.  I meant for it to be in my report.  I
10:20:25 16       apologize if it wasn't explicit, but I think
10:20:27 17       it's still understandable, from what I wrote.
10:20:31 18   Q.  Okay.  And what is that based on?
10:20:33 19   A.  I'm sorry, what is what based on?
10:20:35 20   Q.  Your opinion that ENBREL® caused Mr. Nasset's
10:20:40 21       myocardial infarction and congestive heart
          22       failure?
          23   A.  Well, that caused his heart failure, that's my
10:20:48 24       opinion.
10:20:49 25   Q.  I know.  What is that opinion based on?
```

## Page 59

```
10:20:51  1   A.  It is based on the fact that ENBREL® causes
10:20:53  2       heart failure, that it's a known side effect,
10:20:56  3       that he was taking it when he began to
10:20:59  4       experience heart failure, that he was taking
10:21:03  5       an every-other-week dose, which is half of the
10:21:07  6       dose, which is in the prescribed information.
10:21:11  7       When he went to a weekly dose, to the full
10:21:14  8       dose, close to the prescribing -- or talks
10:21:18  9       about -- he developed heart failure.
10:21:21 10             So there is -- there is proximate
10:21:24 11       causation here.  There is a temporal
10:21:28 12       connection, and there is no other explanation
10:21:31 13       why he would develop it right at that time.
10:21:33 14   Q.  Okay.  Well, what about the fact that patients
10:21:36 15       with inflammatory arthritis are at twice the
10:21:38 16       risk to develop heart disease?
10:21:40 17   A.  It is more likely than not, in my opinion,
10:21:44 18       that, in this case, it was ENBREL®.  Yes, they
10:21:47 19       do.  They do have that increased risk.  But
10:21:53 20       the whole sequence of events, and the whole
10:21:59 21       presentation, to me, it's more likely than
10:22:02 22       not.
10:22:02 23   Q.  Okay.  And so you would not defer to a
10:22:06 24       cardiologist as to what caused Mr. Nasset's
10:22:09 25       heart failure; you believe that you can make
```

## Page 60

```
10:22:11  1       that conclusion.  Correct?
10:22:12  2   A.  Yes, I can.
10:22:17  3   Q.  Okay.  If I represented to you that a
10:22:27  4       rheumatologist, who treated Mr. Nasset,
10:22:32  5       Dr. Emejuaiwe, that she will testify that she
10:22:35  6       advised Mr. Nasset of the risk of congestive
10:22:39  7       heart failure, on June 5th, 2017, would you
10:22:42  8       agree that he was properly consented?
10:22:45  9   A.  I'd have to see the testimony.  I cannot be
10:22:50 10       rendering an opinion, based on description
10:22:53 11       like this.
10:22:54 12   Q.  Okay.  Okay.  I will pull up a signed
10:23:42 13       declaration from Dr. Emejuaiwe, who's a
10:23:50 14       rheumatologist with the VA.  She signed this.
10:23:53 15       And if I have you take a look at number 16.
10:24:30 16   A.  Okay.  What is your question?
10:24:32 17   Q.  Okay.  And then, I'm sorry, I'm just going to
10:24:42 18       have you read number 17, as well.
10:24:45 19   A.  Yes.
10:24:45 20   Q.  Okay.  Now, knowing that Dr. Emejuaiwe will
10:24:45 21       testify that she advised Mr. Nasset of the
10:24:50 22       risk of congestive heart failure on June 5th,
10:24:53 23       2017, would you agree that he was properly
10:24:55 24       consented?
10:25:07 25   A.  I question why there is no written consent
```

DAWN D. TUPPER, CCR, RPR
(504) 430-0491